UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ANDREW COHEN, TIMOTHY
HORNICK, KALEAH C. ALLEN,
KIMBERLY BENJAMIN, MARK
WEILER, MATT KOPPIN, SCOTT
CISCHKE, ALBERT COLLINS, PAUL
COLETTI, KRYSTLE FAERN, RODOLFO
CABRERA, BRANDY DAVIS, WILLIAM
ZIDE, DAVID HEDICKER, NANCY
MAEKAWA, CATHERINE GOODWIN,
KATHLEEN BOGGS, KIMBERLY
MODESITT, MARK KUNZE, ARIANA
RYAN, BECKY WELLINGTON, M. GAIL
SUNDELL, VICTOR PERLMAN, and
ZACHARY GOMOLEKOFF, individually
and on behalf of all other similarly situated,

       Plaintiffs,

  v.

APPLE INC.,

       Defendant.

No. C 19-05322 WHA

**ORDER ON MOTION FOR
SUMMARY JUDGMENT**

## INTRODUCTION

In this putative class action, this order holds that the FCC's radio frequency radiation exposure regulations preempt plaintiffs' tort and consumer-fraud claims.

## STATEMENT

At all material times, defendant Apple, Inc., manufactured and sold a series of industry-defining smartphones known as the iPhone: a cellphone with a broad range of

additional functions based on advanced computing capability, large storage capacity, and internet connectivity. Like other forms of wireless communication, these smartphones relied on radiofrequency electromagnetic waves (RF radiation) to send and receive signals. The oscillation of electrical charges in the phone antennas would generate RF radiation emanating from those antennas. The closer to the body the phone remained while in use, the more RF radiation a user would get.

For at least the last forty years, scientists have weighed in on the health risks associated with RF radiation exposure from radio transmitters. Unlike ionizing radiation (such as X-rays), which is always potentially harmful to human tissue, non-ionizing radiation, such as phones emit, is incapable of breaking the chemical bonds so as to damage DNA. High levels of RF radiation, however, can cause adverse thermal effects, like a burn. More controverted is the purported existence of non-thermal effects caused by lower levels of RF radiation. Such effects, if they exist, may include an increased risk of cancer, cellular stress, structural and functional changes to the reproductive system, learning and memory deficits, genetic damage, and neurological disorders.

Based on its review of the science, the Federal Communications Commission has promulgated RF exposure standards that all cellphones must comply with before being sold in the United States. *Guidelines for Evaluating the Environmental Effects of Radiofrequency Radiation*, 11 F.C.C.R. 15123 ¶ 171 (1996) (*1996 RF Order*). Plaintiffs, purchasers of nine different iPhone models, seek to hold Apple to account for selling iPhones that allegedly do not comply with the Commission's RF emissions standards.

Plaintiffs filed this action in September 2019, seeking to represent "[a]ll persons who have owned or leased an iPhone for personal or household use in the United States." A few weeks later, plaintiffs' counsel filed a nearly identical complaint, also in our district, on behalf of different named plaintiffs. Prior orders related and consolidated the two actions. Following an initial case management conference, plaintiffs filed their consolidated amended class action complaint, now our operative complaint (Dkt. Nos. 47, 51, 53).

The operative complaint alleged seven disclosure-related claims and one negligence claim for medical monitoring.  Plaintiffs based the latter on an allegedly increased risk of harm they may face due to their use of iPhones as advertised.  The disclosure-related claims alleged that Apple marketed its phones for use on or in close proximity to the body, but failed to disclose that such use would allegedly expose consumers to RF radiation levels above the federal standards, and failed to disclose the alleged risk attendant to such exposure.[1]

Apple sought dismissal under a litany of theories, including preemption, lack of standing, and various pleading deficiencies.  Following a hearing, an order found that matters outside the pleadings had been presented in Apple's briefs without sufficient justification.  Apple's motion became one for summary judgment under Rule 56 and discovery opened immediately (Dkt. Nos. 62, 75, 89).

Given the necessary application of FCC regulations and guidance, and particularly the extent to which its regulations could preempt plaintiffs' claims, the Court invited the Commission to participate as an amicus curiae.  The Commission accepted, filing a statement of interest addressing the application of its regulations and guidance to plaintiffs' claims.

After some discovery ensued, Apple moved again for summary judgment on the dispositive issues of preemption and jurisdiction.

Following a hearing, the undersigned judge ordered Apple to produce all communications between Apple and the FCC prior to and related to any certification involved in this action and all communications regarding the *Chicago Tribune* story.  Plaintiffs were allowed a supplemental brief to explain the significance of the produced communications to the pending motion, and Apple an opportunity to respond.  Promptly, Apple filed an emergency motion for clarification and an extension of time to produce the communications.  A prior order granted the motion, and extended the briefing deadlines as well.

---

[1]  The complaint also alleged claims for relief against another smartphone manufacturer, Samsung Electronic America, Inc.  When both parties moved to dismiss, Samsung also moved to compel arbitration.  A week later, plaintiffs voluntarily dismissed their claims against Samsung.

1    Now, plaintiffs all but abandon any reliance on what communications Apple did produce

2    and instead rehash arguments made in their briefs.  The single document plaintiffs found

3    relevant demonstrated, in that instance, that Apple, not the FCC, bore responsibility for its

4    disclosures to consumers in their user manuals.

5    This order follows full briefing, a telephonic hearing (due to the ongoing public health

6    emergency), and supplemental briefing.

7    **ANALYSIS**

8    Plaintiffs seek to hold Apple liable for selling iPhones that allegedly exceeded the

9    Commission's RF radiation exposure limits, making the phones unsafe.  All agree, however,

10    that the Commission certified each and every iPhone model as compliant with its RF

11    regulations.  And, the Commission has determined that all certified cellphones pose no health

12    risks.  Plaintiffs nevertheless insist that a jury should decide whether the iPhones exceed the

13    federal RF exposure standards here, not the administrative agency tasked with developing and

14    administering the safety program.  Under ordinary conflict preemption principles, a state law

15    that "stands as an obstacle to the accomplishment and execution of the full purposes and

16    objectives" of a federal law is pre-empted.  *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).

17    The basic question, then, is whether plaintiffs' tort and consumer-fraud claims that would have

18    juries administer the Commission's regulations would stand as an obstacle to the regulations'

19    own objectives.  This order answers yes, and holds that the claims must be deemed preempted.

20    Before reaching the preemption determination, however, three threshold issues regarding

21    the statutory basis for the RF regulations must be addressed, following a review of the statutory

22    and regulatory background.

23    The Communications Act of 1934 established the Federal Communications Commission

24    as the centralized authority for regulating wire and radio communication, charging the

25    Commission with making available

26        a rapid, efficient, Nation-wide, and world-wide wire and radio
        communication service with adequate facilities at reasonable

27        charges, for the purpose of the national defense, for the purpose of
        promoting safety of life and property through the use of wire and

28        radio communication, and for the purpose of securing a more

4

> effective execution of this policy by centralizing authority
> heretofore granted by law to several agencies and by granting
> additional authority with respect to interstate and foreign
> commerce in wire and radio communication . . . .

47 U.S.C. § 151.  To achieve its broad objectives, Congress endowed the Commission "with comprehensive powers to promote and realize the vast potentialities of radio."  *Nat'l Broad. Co. v. FCC*, 319 U.S. 190, 217 (1943).  One such power included the authority "to regulate 'the kind of apparatus to be used' for wireless radio communications and 'the emissions' that such equipment may produce" (Dkt. No. 101-1, FCC Statement at 3, quoting 47 U.S.C. § 303(e)).[2]

The Commission has played a central role in the development of cellular radio technology since its inception, establishing the basic regulatory structure for the cellular mobile radio service in 1981.  *Cellular Communications Systems*, 86 F.C.C.2d 469, 470 (1981).  At the service's regulatory core is the Commission's sole jurisdiction over radio licensing pursuant to Section 301 of the 1934 Act.  On the equipment side, the rules required compliance with minimum technical standards to ensure efficient and effective use of the radio spectrum licensed for cellular service.  The regulations and guidance expressly asserted federal primacy over the area of technical standards, finding that "any state licensing requirements adding to or conflicting with them could frustrate federal policy."  *Id.* ¶¶ 79–83.

In establishing technical standards for all radio communications, the Commission also took into account its obligations under the National Environmental Policy Act of 1969.  These standards required environmental assessment of proposed transmitting facilities and operations that exceeded applicable health and safety standards for RF radiation exposure.  Although NEPA imposed only procedural requirements, the Commission adopted substantive technical requirements as well, out of "concern that any significant impact on the human environment caused by excessive exposure to RF radiation should be considered as part of

---

[2]  The Communications Act is located at Chapter 5 of Title 47 of the United States Code.  47 U.S.C. §§ 151 *et seq.*  The "short title" of the chapter is "Communications Act of 1934."  47 U.S.C. § 609.  The Telecommunications Act of 1996 contained provisions that amended the Communications Act of 1934 and provisions that did not. Somewhat haphazard use of the Telecommunications Act to refer to the codified Communications Act has led to some confusion.  Unless otherwise specified, this order will refer to the codified Act as the Communications Act only.

United States District Court
Northern District of California

1 FCC procedures for licensing and approving transmitting facilities and operations."

2 *Responsibility of the Federal Communications Commission to Consider Biological Effects of*

3 *Radiofrequency Radiation When Authorizing the Use of Radiofrequency Devices*, 2 F.C.C.R.

4 2064 ¶ 2.

5     The 1985 rules largely adopted safety guidelines prepared by the American National

6 Standards Institute in 1982, but excluded low-power devices such as cellphones.  In 1993,

7 however, a rulemaking commenced in light of a new ANSI standard that was "generally more

8 stringent in the evaluation of low-power devices." *1996 RF Order*, 11 F.C.C.R. 15123 ¶ 9.

9 In the meantime, Congress enacted the Telecommunications Act of 1996, which, in

10 Section 704(b), directed the Commission to "complete action" within 180 days on its pending

11 proceeding "to prescribe and make effective rules regarding the environmental effects of radio

12 frequency emissions."

13     And so it did, issuing an order adopting new RF exposure guidelines the same year.

14 *1996 RF Order*, 11 F.C.C.R. 15123 ¶ 1.  Consistent with the 1992 ANSI/IEEE standard, the

15 Commission adopted RF exposure limits for cellphones for the first time.  *Id.* ¶¶ 63–64.

16 Despite court challenges and regular reevaluation by the Commission, the 1996 exposure limits

17 and basic regulatory framework have remained in place.

18     Periodically since their establishment, the Commission has reviewed the 1996 standards

19 to ensure they have kept pace with current knowledge and changing needs.  To that end, a 2013

20 inquiry requested comment to determine whether the federal RF exposure limits and policies,

21 including the prescribed testing parameters, needed reassessment.  In 2019, an order found that

22 the current research continued to support the existing standards, concluding that the 1996 RF

23 exposure limits and testing parameters remained sufficient to protect human safety.  The order

24 thus terminated the 2013 notice of inquiry.  Notably, the Commission determined that "phones

25 legally sold in the United States pose[d] no health risks." *Resolution of Notice of Inquiry,*

26 *Second Report and Order, Notice of Proposed Rulemaking, and Memorandum Opinion and*

27 *Order*, 34 F.C.C.R. 11687 ¶ 14 (2019) (*2019 RF Order*).

28

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

Although the *2019 RF Order* came in December 2019, the Commission announced its proposed findings in August 2019.  Two weeks later, the *Chicago Tribune* reported that it (the newspaper) had conducted an independent investigation finding that many major cell phones sold in the United States, including the iPhone models it tested, exposed consumers to RF radiation levels in excess of the Commission's limits.  It based its findings on independent testing it had ordered from an "FCC-recognized accredited lab."  Although Apple tested most of its iPhones at a test separation distance of five millimeters, pursuant to the federal guidelines, the *Tribune* tested the phones at both five and two millimeter separation distances — the two millimeter distance approximating the distance a phone carried in pants or shirt pockets would be from the body.  The phones allegedly exceeded the FCC limits at each distance, including at the five-millimeter distance used by Apple in its certification filing.  As will be discussed below, Apple and the Commission dispute the significance of the independent testing.

Two days after the *Tribune* published its story, plaintiffs filed this putative class action.  In September 2019, plaintiffs' counsel conducted their own RF emissions testing.  Counsel enlisted the same lab as had the *Tribune*, but added additional iPhone models and a zero millimeter testing distance to replicate use of the phones against the skin.  The reason for testing the phones in this manner was intertwined with plaintiffs' theories of liability.  As discussed, Apple's marketing allegedly deceived and misled plaintiffs into believing that iPhones could be used on or in close proximity to the body without exceeding FCC RF exposure limits.  For example, Apple touted its iPhones as "the Internet in your pocket," "your life in your pocket," and a "studio in your pocket."  When tested to imitate this closer use, plaintiffs allege that iPhones exceeded the federal limits.

In December 2019 and one day before plaintiffs filed their amended complaint, the previously announced *2019 RF Order* issued.  The order formally rejected claims that RF exposure testing of cell phones should be done with "zero spacing."  It found such against-the-body testing unnecessary for reasons discussed in more detail below.  Pertinent to plaintiffs' disclosure-related claims, the order found that even if consumers normally used

7

Commission-certified phones at a closer distance than tested, and even if a certified phone

exceeded the federal limits under such normal use against the body, the order found that large

safety margins had been built into the existing testing requirements and RF exposure limits

would still sufficiently protect human safety.  *FCC 2019 RF Order*, 34 F.C.C.R. 11687 ¶ 14.

Also in December 2019, the Commission published the results of testing it undertook in

response to the *Tribune*'s claims of noncompliance.  Each of the implicated phones had been

tested at the test separation distances used in each device's original certification filing (not at

two millimeters, as the *Tribune* additionally had) and consistent with OED's parameters.  For

iPhones, the FCC Lab tested at five millimeters.  The RF radiation exposure from each of the

iPhones measured fell well within the safety limits.  The Lab found no evidence of violations

of the technical standards.

*                              *                              *

Taking a closer look at the Commission's rules, the RF radiation exposure regulations

fall within the equipment authorization procedures found in Part 2 of the rules.  47 C.F.R.

§§ 2.901 *et seq.*  The Chief of the Office of Engineering and Technology (OET) is charged

with administering the equipment authorization program.  47 C.F.R. § 0.241(b).  Section 2.901

sets forth the "basis and purpose" of the equipment authorization rules:

> In order to carry out its responsibilities under the Communications
> Act and the various treaties and international regulations, and in
> order to promote efficient use of the radio spectrum, the
> Commission has developed technical standards for radio frequency
> equipment and parts or components thereof.  The technical
> standards applicable to individual types of equipment are found in
> that part of the rules governing the service wherein the equipment
> is to be operated.

Prior to marketing or use, cellphone manufacturers must ensure compliance with the RF

exposure limits, using device-type specific criteria for demonstrating compliance.  Third-party

accrediting organizations recognized by the Commission, known as Telecommunication

Certification Boards, review and grant applications for certification if the device is found

capable of complying with applicable technical standards and if granting the application would

serve the public interest, convenience, and necessity.  Once certification has been granted, the

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Commission maintains its regulatory grip by acting on complaints of noncompliance.  To that

2    end, it may require a manufacturer to investigate the complaint or it may do so on its own,

3    through its OET Laboratory.  Manufacturers must provide a sample of the device as well as

4    pertinent records upon request.  If upon inspection it is determined that the equipment does not

5    comply with the technical standards, the device's certification may be revoked.  47 C.F.R.

6    §§ 2.803, 2.805, 2.915, 2.937, 2.939, 2.945, 2.1093, 24.51, 24.52.

7    　　　The Communications Act, as amended, provided the statutory basis for the equipment

8    authorization program.  The provisions relevant to cellphone RF exposure limits include the

9    general rulemaking provisions, Sections 154(i) and 303(r) — both grant authority to "[m]ake

10   such rules and regulations and prescribe such restrictions and conditions, not inconsistent with

11   law, as may be necessary to carry out the provisions of this chapter"  — and section 303(e),

12   which charges the Commission with regulating, as the public convenience, interest, or

13   necessity requires, "the kind of apparatus to be used" for wireless radio communications and

14   "the emissions" that such equipment may produce.

15                    *                    *                    *

16   　　　As discussed, plaintiffs raise three threshold arguments concerning the statutory basis for

17   the regulatory scheme at issue.  *First*, plaintiffs argue that the regulations were promulgated

18   under NEPA, which they assert cannot impose substantive obligations capable of conflicting

19   with state law.  Plaintiffs correctly note that NEPA is a procedural statute that "does not

20   mandate particular results" but rather "imposes only procedural requirements on federal

21   agencies."  *DOT v. Public Citizen*, 541 U.S. 752, 756 (2004) (internal quotation marks

22   omitted).  What plaintiffs ignore, however, is that while the Commission began its review in

23   light of NEPA, it subsequently chose to mandate "particular results" by promulgating

24   *substantive* rules under its longstanding Communications Act authority, delegated by Congress

25   in 1934.  *1996 RF Order*, 11 F.C.C.R. 15123 ¶ 171.

26   　　　Plaintiffs rely on *Jasso v. Citizens Telecommunications Co. of CA, Inc.*, 2007 WL

27   2221031 at *7 (E.D. Cal. Jul. 30, 2007) (Judge Edmund Brennan), for the proposition that

28   NEPA imposes no substantive requirements, and is therefore irrelevant.  But *Jasso* goes on to

9

explain what *is* relevant:  that the Commission decided to adopt substantive requirements under the Communications Act when it promulgated its RF regulations.  2007 WL 2221031 at *7; *see, e.g.*, 47 C.F.R. § 27.52.  It is these substantive requirements that preempt.

*Second*, we must determine whether a 1996 Act saving clause (quoted below) amending the Communications Act curtailed authority to impliedly preempt plaintiffs' claims.  Although a saving clause raises the inference that Congress did not intend to preempt state law, the existence of a saving clause does not foreclose or limit the operation of ordinary preemption principles.  *Geier*, 529 U.S. at 869, 874 (2000).  Pursuant to such principles, "we infer that Congress did not intend the saving provisions in a federal law to be interpreted in a way that causes the federal law 'to defeat its own objectives, or potentially, as the Court has put it before, to destroy itself.'"  The competing inferences simply mean we "interpret a saving clause as [we] would any statutory language:  giving effect to its plain language and meaning in a way that best comports with the statute as a whole."  *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation*, 959 F.3d 1201, 1214 (9th Cir. 2020) (quoting *Geier*, 529 U.S. at 872).

Plaintiffs argue that a saving clause within a provision titled "Removal of barriers to entry," granted authority to preempt certain state and local requirements, but only after providing notice and an opportunity for public comment.  47 U.S.C. § 253(b).  That much is true.  Plaintiffs go further, however, reading the 1996 Act to require notice-and-comment rulemaking in all cases of preemption.  Plaintiffs paraphrase the law as follows (Opp. at 16) (emphasis and ellipses added by plaintiffs):

> In 47 U.S.C. § 253(b), Congress expressly preserved state authority to "impose, on a competitively neutral basis . . . requirements necessary to preserve and advance universal services, *protect the public safety and welfare*, ensure the continued quality of telecommunications services, and *safeguard the rights of consumers*." (emphasis added).  In 47 U.S.C. § 253(d) it authorized the FCC to preempt "the enforcement" of state or local statutes, regulations, or "legal requirement[s]" that do not meet those statutory requirements, "to the extent necessary to correct such violation or inconsistency."  [footnote omitted.]  Such preemptive action must be preceded by "notice and an opportunity for public comment."  *Id.*

Section 253 actually provides, in part (emphasis added):

> (a) In general
>
> No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.
>
> (b) State regulatory authority
>
> *Nothing in this section* shall affect the ability of a State to impose, on a competitively neutral basis and consistent with section 254 of this title, requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers.[3]
>
> [. . .]
>
> (d) Preemption
>
> If, after notice and an opportunity for public comment, the Commission determines that a State or local government has permitted or imposed any statute, regulation, or legal requirement that violates subsection (a) or (b), the Commission shall preempt the enforcement of such statute, regulation, or legal requirement to the extent necessary to correct such violation or inconsistency.

Plaintiffs' version of the law suffers two key omissions: *First*, plaintiffs omit Subsection (a) entirely, which expressly preempts state and local law standing as industry barriers to entry; *second*, plaintiffs strip Subsection (b) of its key limitation — that it applies to Section 253 only. Rather than generally preserve state authority over specific regulatory objectives, as plaintiffs suggest, Subsection (b) merely claws back those objectives from Subsection (a)'s preemptive reach. Subsection (d), on the other hand, enforces this intricate boundary: If, after providing notice and an opportunity for public comment, the Commission determines the state or local regulation violates Subsections (a) or (b), the state or local regulation *shall* be preempted. No such action has been taken here, nor could it have, as the legal requirement plaintiffs seek to impose does not yet exist. Nothing in the plain language of Section 253

---

[3] Section 254 established a federal-state joint board to work with the Commission in advancing "universal service," a program to ensure that consumers in rural, insular, and high-cost areas have access to modern communications networks capable of providing voice and broadband service, both fixed and mobile, at rates that are reasonably comparable to those in urban areas.

otherwise affects our analysis. *In re Volkswagen*, 959 F.3d at 1214.  Observe how the intricate mechanics of Section 253 contrast sharply with the regulatory powerhouses that *do* carry preemptive weight here, Sections 154 and 303 of the Communications Act.

*Third*, plaintiffs put Section 601(c)(1) of the 1996 Act forward (included in notes to 47 U.S.C. § 152):

> NO IMPLIED EFFECT. — This Act and the amendments made by this Act shall not be construed to modify, impair, or supersede Federal, State, or local law unless expressly so provided in such Act or amendments.

Unlike Section 253(b), Section 601(c)(1) is not an ordinary saving clause.  It forbids both implied repeal of federal law and implied preemption of state and local law.  Rather than express a preference one way or the other, the manifest purpose is to preserve a pre-existing balance between the various sources of law.  And, by its terms, the provision applied only to provisions of, or amendments made by "this Act," the 1996 Act.  The plain language of Section 601(c)(1) thus preserves the authority delegated under the 1934 Act unless expressly otherwise provided by the 1996 Act.  *In re Volkswagen*, 959 F.3d at 1214.

Plaintiffs take an alternative reading, assuming that Section 601(c)(1) of the 1996 Act also applied to the 1934 Communications Act.  47 U.S.C. §§ 151 *et seq.*  The plain language militates against such a reading.  Two further points, however, confirm the plain meaning.  *First*, Section 1(b) of the 1996 Act states:

> Except as otherwise expressly provided, whenever in this Act an amendment or repeal is expressed in terms of an amendment to, or repeal of, a section or other provision, the reference shall be considered to be made to a section or other provision of the Communications Act of 1934 (47 U.S.C. 151 *et seq.*).

Section 1(b) emphasizes the distinction between the 1996 Act and the 1934 Act.  We must read Section 601(c)(1) as applying to "[the 1996 Act] and the amendments made by [the 1996 Act]" to the Communications Act of 1934.  *Second*, Section 601(c)(1) itself is not an amendment to the code but instead a note to Section 152.  Its placement as a note comports with its plain language.  Plaintiffs' alternative take would abolish implied preemption long exercised under

the Communications Act in a provision that Congress left out of the Communications Act itself.

On the merits of Section 601(c)(1), plaintiffs do not identify any provision of the 1996 Act that affects the Commission's authority to regulate RF radiation exposure. Instead, plaintiffs argue that "Section 601(c)(1) emphasizes Congress's clear intent that preemption must be express and a result of the legislative process or notice and comment rulemaking" (Opp. at 17). Without pointing to any express provision of the 1996 Act, plaintiffs ask that we read into Section 601(c)(1) an intent to substantively alter longstanding Communications Act authority. By the provision's own terms, plaintiffs reading is verboten.

To be sure, the 1996 Act did circumscribe the Commission's broad authority somewhat, removing from it the power to "limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction and modification of personal wireless service facilities." 47 U.S.C. § 332(c)(7)(A). The new Section 332(c)(7) "prevents Commission preemption of local and State land use decisions and preserves the authority of State and local governments over zoning and land use matters except in the limited circumstances . . . ." H.R. Conf. Rep. 104-458, at 208–09 (1996). But, echoing Section 601(c)(1)'s intent to preserve, the Conference Report also provided:

> The limitations on the role and powers of the Commission under this [Section 332(c)(7)] relate to local land use regulations and are not intended to limit or affect the Commission's general authority over radio telecommunications, including the authority to regulate the construction, modification and operation of radio facilities.

*Id.* at 209. Plaintiffs' claims do not involve local land use regulations.

*        *        *

Having rejected plaintiffs' arguments that the Telecommunications Act altered the Commission's general authority over radio telecommunications pursuant to the Communications Act, the question becomes whether plaintiffs' tort and consumer-fraud claims stand as an obstacle to the federal equipment-authorization regime.

The Supremacy Clause provides that the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land." State

law can be preempted by constitutional text, by federal statute, or by a federal regulation. *P.R. Dep't of Consumer Affs. v. Isla Petroleum Corp.*, 485 U.S. 495, 503 (1988); *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982). Where, as here, we consider whether a federal agency has preempted state regulation, we do not focus on Congress's "intent to supersede state law" because a "preemptive regulation's force does not depend on express congressional authorization to displace state law." *De la Cuesta*, 458 U.S. at 154. Instead, we ask "whether [the federal agency] meant to preempt [the state law], and, if so, whether that action is within the scope of the [federal agency's] delegated authority." *Ibid.*

Apple's conflict preemption theory relies on the proposition that a state law is preempted if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives" of a federal law. *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). To evaluate whether a state law poses an obstacle to the implementation of a federal program, the "pertinent question" is whether the state law "sufficiently injure[s] the objectives of the federal program to require nonrecognition." *Hisquierdo v. Hisquierdo*, 439 U.S. 572, 583 (1979).[4]

To find obstacle preemption, we infer that Congress made "a considered judgment" or "a deliberate choice" to preclude state regulation when a federal enactment clearly struck a particular balance of interests that would be disturbed or impeded by state regulation. *Arizona v. United States*, 567 U.S. 387, 405 (2012). For example, a state law imposing criminal penalties on aliens who sought or engaged in unlawful employment "would interfere with the careful balance struck by Congress," because "Congress made a deliberate choice not to impose criminal penalties" for the same conduct. *Id.* at 405–06. Similarly, where federal safety regulations "deliberately sought a gradual phase-in" of airbags to give manufacturers more time and increase public acceptance, state tort law requiring the immediate installation of airbags would have "stood as an obstacle" to the phase-in program "that the federal regulation deliberately imposed." *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 879–81

United States District Court
Northern District of California

---

[4] This order assumes without deciding that a presumption against preemption applies here. *See Wyeth v. Levine*, 555 U.S. 555, 565, 565 n.3 (2009). While Congress has long exerted control over radio communications, state governments have traditionally regulated the field of public health and welfare. State-law actions based on the risks associated with RF emissions fall within the traditional police power.

14

(2000). Where Congress has determined the appropriate balance, state regulation involving a different method of enforcement may upset that balance and be displaced by federal law even where the state "attempts to achieve one of the same goals as federal law." *Arizona*, 567 U.S. at 406.

The Supreme Court likewise found preempted state tort law that sought to impose liability for alleged fraudulent misrepresentations made to the FDA in the medical device context, where Congress had "amply empower[ed]" the FDA to punish misrepresentations and the FDA had used this authority to reach a balance between ensuring both that medical devices are reasonably safe and effective, and that an approved device is on the market within a relatively short period of time. *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 353 (2001). "[F]lexibility" in "pursu[ing] difficult (and often competing) objectives" was essential to the FDA's mandate. *Id.* at 349. Although state tort law would further the FDA's safety objective, it would increase the burdens on industry by requiring compliance with various state standards and diminish the expediency of the approval process. *Id.* at 350–51.

Plaintiffs summarize their claims in their opposition (Opp. at 11):

> Plaintiffs seek to hold Apple accountable for selling iPhones that do not comply with FCC RF emissions standards. Plaintiffs' disclosure-related claims allege that Apple marketed its phones for use on or in close proximity to the body, but did not disclose to consumers (a) that such usage would expose them to RF radiation levels exceeding the federal SAR limit of 1.6 W/kg or (b) the risks attendant to that exposure. Plaintiffs further allege that, when used as advertised, the iPhones emit RF radiation at levels that exceed the FCC safety threshold (SAR limit) and therefore pose an increased risk of harm to Plaintiffs, for which Plaintiffs seek medical monitoring. Plaintiffs assume that the FCC's RF emissions standards and SAR limit are appropriate.

Plaintiffs' vague allegation "that Apple marketed its phones for use on or in close proximity to the body" has caused some difficulty in nailing down the scope of the claims. The complaint recounted the debate over test separation distances and reported the results of laboratory testing measured at a distance of two millimeters and zero millimeters. The Commission's procedures, on the other hand, impose only a five-millimeter minimum test separation distance. And the *2019 RF Order* rejected proposals to require testing at a closer distance. 34 F.C.C.R.

1    11687 ¶ 15 & n.47.  Now, plaintiffs argue that "neither the FCC RF emissions standards nor

2    the FCC's testing procedures will be called into question" and that plaintiffs' "claims do not

3    turn on the issue of test separation distance" (Opp. at 20).  Rather, each and every claim

4    supposedly relies on the alleged fact that even at five millimeters, plaintiffs' iPhones do not

5    meet the Commission's RF exposure standards.

6            Ultimately, however, the outcome is the same.  The equipment-authorization regime is

7    statutorily authorized and, examining the regulations, the legislative and regulatory history, and

8    the agency's own views, as this order now will, it is evident that the Commission intended to

9    create a uniform, nation-wide regime that balanced competing objectives of safety and

10   efficiency.  This order finds that plaintiffs' claims threaten that careful balance in the

11   equipment-authorization regime, whether plaintiffs challenge the testing procedures or merely

12   seek to enforce the existing RF standards.

13          As discussed, the Communications Act of 1934 established the Commission with

14   expansive powers extending to all regulatory actions "necessary to ensure the achievement of

15   the Commission's statutory responsibilities."  *FCC v. Midwest Video Corp.*, 440 U.S. 689, 706

16   (1979).  In 1981, that broad regulatory was put to use in establishing the basic regulatory

17   structure for the cellular mobile radio service.  *Cellular Communications Systems*, 86 F.C.C.2d

18   469, 470 (1981).  In so doing, the Commission invoked its sole jurisdiction over radio licensing

19   pursuant to Section 301 of the 1934 Act.  The equipment authorization program under the 1981

20   rules, as today, required compliance with minimum technical standards to ensure efficient and

21   effective use of the radio spectrum allocated for cellular service.  At that time, federal primacy

22   was asserted over the area of technical standards because "any state licensing requirements

23   adding to or conflicting with them could frustrate federal policy."  *Id.* ¶¶ 79–83.

24          The Telecommunications Act of 1996 and its legislative history reveal that Congress

25   contemplated continued control over radio telecommunications.  The relevant House

26   Committee believed that

27            it is in the national interest that uniform, consistent requirements,
             with adequate safeguards of the public health and safety, be
28           established as soon as possible.  Such requirements will ensure an

United States District Court
Northern District of California

16

> appropriate balance in policy and will speed deployment and the
> availability of competitive wireless telecommunications services
> which ultimately will provide consumers with lower costs as well
> as with a greater range and options for such services.

H.R. Rep. 104–204, pt. 1, at 94.  Even where the 1996 Act curtailed its power to preempt local

land use regulation, the Act expressly did not "limit or affect the Commission's general

authority over radio telecommunications, including the authority to regulate the construction,

modification and operation of radio facilities."  H.R. Conf. Rep. 104-458, at 208–09.

Exercising that general authority, the first RF exposure rules for cellphones hit the books

in 1996.  The exposure limits "provided a proper balance between the need to protect the

public and workers from exposure to excessive RF electromagnetic fields and the need to allow

communications services to readily address growing marketplace demands."  *1997 RF Order*,

13 F.C.C.R. 7268 ¶¶ 5, 29.  The 2013 Notice of Inquiry maintained this view, explaining:

> The intent of our exposure limits is to provide a cap that both
> protects the public based on scientific consensus and allows for
> efficient and practical implementation of wireless services.  The
> present Commission exposure limit is a "bright-line rule."  That is,
> so long as exposure levels are below a specified limit value, there
> is no requirement to further reduce exposure. . . .  Our current RF
> exposure guidelines are an example of such regulation, including a
> significant "safety" factor, whereby the exposure limits are set at a
> level on the order of 50 times below the level at which adverse
> biological effects have been observed in laboratory animals as a
> result of tissue heating resulting from RF exposure.

*In re Reassessment of FCC Radiofrequency Exposure Limits and Policies*, 28 F.C.C.R.

3498, 3582 (Mar. 29, 2013).  The *2019 RF Order* provided an example of how RF exposure

limits factor into the backstage goal of promoting industry growth (rather than safety).  In

rejecting proposals for lower RF exposure limits, the order concluded that "[n]o device could

reliably transmit any usable level of energy by today's technological standards while meeting

those limits."  *2019 RF Order*, 34 F.C.C.R. 11687 ¶ 12.

As discussed, the regulations themselves fall within the Commission's equipment

authorization program consisting of "technical standards for radio frequency equipment"

developed "to carry out its responsibilities under the Communications Act . . . to promote

efficient use of the radio spectrum . . . ."  47 C.F.R. § 2.901.  Telecommunications Certification

Boards review and grant applications for certification if the device is found capable of

17

complying with applicable technical standards and if granting the application would serve the public interest, convenience, and necessity — the guiding principles behind all discretionary action taken or authorized by the Commission.  47 C.F.R. §§ 2.915, 2.937, 2.939, 2.945, 2.1093, 24.51, 24.52; *see* 47 U.S.C. § 303 (setting forth the powers and duties of the Commission to be exercised "as public convenience, interest, or necessity requires").

The *2019 RF Order*, which resolved an inquiry into the currency of the 1996 rules, made two additional determinations key to our conflict analysis.  *First*, it "decline[d] to revisit [its] RF exposure evaluation procedures for consumer portable devices, especially phones." *2019 RF Order*, 34 F.C.C.R. 11687 ¶ 14.  To the extent plaintiffs' claims challenge the adequacy of its testing procedures, the *2019 RF Order* rejected similar claims that cellphone RF exposure evaluation should "require testing with a 'zero' spacing — against the body —" finding such testing unnecessary for four reasons (*ibid.*) (emphasis added and footnotes omitted):

> *First*, phones are tested against the head without any separation distance to represent normal use conditions during a phone call. *Second*, at maximum power, even though they are not consistently operated at such power levels.  This means that testing is performed under more extreme conditions than a user would normally encounter, so any potential dangers at zero-space would be mitigated.  *Third*, actual testing separation distances tend to be less than the 2.5 cm prescribed for many devices.  For example, phones with tethering capabilities (i.e., "hotspot mode") are tested at a maximum separation distance from the human body of 1 cm. *Fourth*, our existing exposure limits are set with a large safety margin, well below the threshold for unacceptable rises in human tissue temperature. [5]

Certain manufacturers, the order pointed out, use "features like proximity sensors, which reduce power when close to a user's body, to ensure they are compliant even if the phones are used in a nonconforming manner . . . .  Power control and discontinuous transmission on the devices assures that devices operate well below maximum power for the vast majority of the time, and hence result in lower RF exposure."  *Id.* ¶ 14 n.47.

---

[5]  All agree that iPhones are tested with a five millimeter spacing rather than one centimeter.

18

The order concluded that "even if certified or otherwise authorized devices produce RF exposure levels *in excess of Commission limits under normal use*, such exposure would still be well below levels considered to be dangerous, and therefore *phones legally sold in the United States pose no health risks.*" *Id.* ¶ 14 (emphasis added).  The Commission also provided its view that "any claim as to the adequacy of the FCC required testing, certification, and authorization regime is no different than a challenge to the adequacy of the federal RF exposure limits themselves.  Both types of claims would undermine the FCC's substantive policy determinations." *Id.* ¶ 14 n.49.

*Second*, pertinent to the disclosure-related claims, the *2019 RF Order* also affirmed a commitment to "ensur[ing] that relevant information is made available to the public."  To that end, "the Commission maintains several webpages that provide information about RF exposure to the public" and "guidance from the FCC Laboratory continue recommending that device manuals include operating instructions and advisory statements for RF exposure compliance." *Id.* ¶ 16.  The FCC Laboratory has stated that operating manuals must include "[s]pecific information . . . to enable users to select body-worn accessories that meet the minimum test separation distance requirements."  KDB 447498 D01, at 11.[6]

The order also emphasized the importance of the "context and placement of RF exposure information" to avoid giving the misimpression that FCC-certified cell phones are unsafe. In the end, "[g]iven the federal safety determination" that RF emissions from certified cell phones pose no health risks, the Commission concluded that the information on its website "and in device manuals" was not only "adequate to inform consumers of [RF exposure] issues," but also did "not risk contributing to an erroneous public perception or overwarning of RF emissions from FCC certified or authorized devices." *2019 RF Order*, 34 F.C.C.R. 11687 ¶ 16.

In sum, the Communications Act charged the Commission with enabling a uniform, nationwide network for radio communications and empowered it with broad authority to

---

[6]  Both sides agree that guidance from the FCC Laboratory carries the same weight as the Commission's regulations.

United States District Court
Northern District of California

United States District Court
Northern District of California

accomplish that broad goal. Specifically, it held general authority over the regulation of radio facilities and management of the available spectrum. Regulations promulgated thereunder have long required radio facilities and their components meet minimum technical standards to ensure efficient and effective use of the radio spectrum allocated for cellular service. And in promulgating the RF exposure standards at issue, the Commission established uniform standards that balanced competing objectives of safety and efficiency.

Against this history and framework, we also consider the Commission's views of plaintiffs' claims. As in *Geier*, "the agency's own views should make a difference." 529 U.S. at 883. As discussed, the Commission's General Counsel filed a statement of interest addressing the claims here.

At bottom, the Commission tells us that its equipment-authorization scheme preempts plaintiffs' claims here. To the extent plaintiffs contend that Apple should be held liable under state law for selling iPhones that might exceed the RF exposure limits when tested in ways not required by the agency's own rules, plaintiffs' claims challenge the testing procedures themselves. And, "if plaintiffs were to prevail in that challenge, they would undermine the FCC's efforts to create and implement a uniform and reliable process for certifying that cell phones comply with RF limits" (FCC Statement at 15). In this way, plaintiffs' claims are no different than claims that certified phones are unsafe even though they comply with the federal exposure limits. Allowing this case to proceed and "permitting alternative state [certification] standards to arise via the imposition of liability" in this lawsuit "would conflict with the [Commission's] deliberate policy choice." *Farina v. Nokia*, 625 F.3d 97, 123 (3d Cir. 2010); *see also Geier*, 529 U.S. at 881.

The statement also addressed the discrepancy between plaintiffs' third-party testing and both its and Apple's testing. While it could not explain why the third-party testing deviated from the results of Apple and the Commission, it posited that the third-party tests may not have been conducted in accordance with the prescribed procedures. The proper position of a phone during the test can be critical to obtaining accurate results. "Modern cell phones have a very large number of sensors, transmitters and antennas which need to be properly configured to

United States District Court
Northern District of California

ensure that the tests are conducted in the worst-case permissible operation . . . .  Testing each cell phone under its worst-case configuration requires detailed understanding of its design and antenna arrangements; most of this information is non-public and proprietary" (FCC Statement at 16).  The statement thus concluded, with regard to the technical standards, that "[t]hese complex technical issues of phone design and configuration underscore the need for a uniform certification regime.  Lawsuits like this one would needlessly disrupt the Commission's certification process and improperly impede the marketing of cell phones that the FCC has found to be safe" (*ibid.*).

Finally, the statement addressed the impact of its *2019 RF Order* on plaintiffs' disclosure-related claims (FCC Statement at 17–19).  Noting that state disclosure requirements that stand as an obstacle to the implementation of federal disclosure rules are preempted by federal law, *Credit Suisse First Boston Corp. v. Grunwald*, 400 F.3d 1119, 1135-36 (9th Cir. 2005), the order stated that it "has a legitimate interest in guarding against 'overwarning' about the potential dangers of a product sold to consumers" (*id.* at 18).  In its view, "[p]laintiffs' claims regarding the adequacy of Apple's disclosures risks precisely the kind of 'overwarning' regarding RF exposure that concerned the" Commission in its *2019 RF Order* (FCC Statement at 19):

> If plaintiffs were to prevail on such claims, Apple could be compelled to disclose that its FCC-certified cell phones exceed the FCC's RF exposure limits in some circumstances, even though "such exposure would . . . be well below levels considered to be dangerous" given the "large safety margin" built into the FCC's limits. *See 2019 RF Order* ¶ 14.  Any such disclosures would "risk contributing to an erroneous public perception" regarding the safety of FCC-certified cell phones. *See id.* ¶ 16.  Therefore, insofar as plaintiffs' claims are based on the premise that Apple has a duty to disclose additional information about the RF emissions of its FCC-certified cell phones, they conflict with the FCC's considered policy judgment regarding how best and in what form to disseminate relevant information about RF exposure to the public.  They are thus beyond the Court's jurisdiction and in any event preempted.

Putting it all together, the statement concluded:

> The FCC's testing parameters reflect the agency's considered policy judgment about the best way to evaluate and ensure the safety of cell phones made available for sale in the United States.

> To the extent that plaintiffs' lawsuit challenges the validity or sufficiency of those parameters, the Court lacks jurisdiction to entertain those claims. To the extent plaintiffs assert claims that cell phones certified for sale in the United States are nonetheless unsafe, their claims are preempted. Finally, insofar as plaintiffs contend that Apple was required to provide additional consumer disclosures regarding its FCC-certified cell phones, those claims conflict with the FCC's contrary determination that its existing disclosure requirements adequately inform the American public. Accordingly, they are likewise beyond the Court's jurisdiction and in any event preempted.

This order agrees with the Commission. The equipment-authorization regime represents a "deliberate choice" to establish uniform technical standards embodying a careful balance between safety and efficiency. If successful, plaintiffs' claims could set the stage for a patchwork of state-required testing procedures, increasing the burden on manufacturers and thereby upsetting the efficiency that the uniform standards and testing procedures provide. *Geier*, 529 U.S. at 879–81; *Buckman*, 531 U.S. at 353. As it stated, "[l]awsuits like this one would needlessly disrupt the Commission's certification process and improperly impede the marketing of cell phones that the FCC has found to be safe" (FCC Statement at 16). Even though plaintiffs' state-law claims "attempt[ ] to achieve one of the same goals as federal law" — namely, safety — the enforcement of the equipment-authorization regime by state tort suits such as plaintiffs' would upset the balance struck by the regulations and must fall aside. *Arizona*, 567 U.S. at 406.

Our court of appeals has not considered this issue, but decisions in analogous cases outside of our circuit agree. In *Murray v. Motorola, Inc.*, 982 A.2d 764, 769–70 (D.C. 2009), plaintiffs sued a number of cell phone companies and handset manufacturers under District of Columbia law, alleging that the plaintiffs had suffered injury as a result of using cell phones produced, sold, or promoted by the defendants. *Murray* held that "insofar as plaintiffs' claims rest[ed] on allegations about the inadequacy of the FCC's RF radiation standard or about the safety of their FCC-certified cellphones, the claims [were] preempted under the doctrine of conflict preemption." *Id.* at 777.

The panel further held that its conflict-preemption ruling did not foreclose potential liability under the District of Columbia's consumer-protection law "for providing plaintiffs

with false and misleading information about their cell phones, or for omitting material information about the phones." Those claims, the court explained, would not require plaintiffs "to prove that cell phones emit unreasonably dangerous levels of radiation." *Id.* at 783. Accordingly, *Murray* permitted plaintiffs to proceed with allegations that the defendants had "falsely represented that [r]esearch has shown that there is absolutely no risk of harm associated with the use of cell phones," and that the defendants had failed to inform consumers of steps that could be taken to mitigate RF exposure, "[t]o the extent that the[ ] claims [were] not read as claims that cell phones are unreasonably dangerous." *Id.* at 784.

The United States and the Commission jointly filed an amicus brief in *Murray*, arguing that the Commission's RF regulations preempted any lawsuit asserting claims that wireless phones in compliance with the FCC's RF standards were unsafe. The government contended both that federal law had occupied the field of technical standards for RF transmissions, and that the suit "plainly conflict[ed] with the FCC's RF exposure regulations." Quoting the *1997 RF Order*, the amicus brief explained that the Commission's RF standards "are not simply a minimum requirement" that States are free to supplement, but instead "set the 'proper balance between the need to protect the public and workers . . . and the need to allow communications services to readily address growing marketplace demands.'" Amicus Br. of the United States and the F.C.C., *Murray*, No. 07-cv-1074 at 12–18.

In *Farina v. Nokia*, 625 F.3d 97, 104 (3d Cir. 2010), *cert. denied*, 565 U.S. 928 (2011), the plaintiff brought a putative class action claiming that the operation of cellphones without a headset exposed the user to unsafe amounts of RF radiation, challenging the manufacturer's marketing of its cellphones without a headset as safe. *Farina* dismissed the complaint. It found that "[a] jury determination that cellphones in compliance with the FCC's [RF exposure] guidelines were still unreasonably dangerous would, in essence, permit a jury to second guess the FCC's conclusion on how to balance its objectives." Such a result, the panel observed, would disturb the "balancing of safety and efficiency" embodied in the Commission's exposure limits. The panel further noted that the "resulting state-law standards

could vary from state to state, eradicating the uniformity necessary to regulating the wireless network." *Id.* at 126–27.

On petition for a writ of certiorari, the Supreme Court invited the Solicitor General to express the views of the United States.  Relying on *Buckman*, 531 U.S. at 348, the United States opined that "[t]he court of appeals correctly held that petitioner's suit [was] preempted because the state-law rule it [sought] to impose would conflict with the FCC's RF regulations[,]" again asserting that the Commission "intended to strike 'a proper balance between the need to protect the public and workers from exposure to potentially harmful RF electromagnetic fields and the requirement that industry be allowed to provide telecommunications services to the public in the most efficient and practical manner possible." The government also noted that it had consistently "made clear in amicus filings that state lawsuits challenging the safety of FCC-certified wireless phones conflict with the federal policy objectives underlying the FCC's RF rules."  Brief for the United States as Amici Curiae, *Farina*, No. 10-1064, 2011 WL 3799082 at *9–12.

The outlier is *Pinney v. Nokia, Inc.*, 402 F.3d 430, 456–58 (4th Cir. 2005), *cert. denied*, 546 U.S. 998 (2005), in which a divided panel of the Fourth Circuit held that a lawsuit challenging the safety of wireless phones did not conflict with federal law.  *Pinney* was decided before the Commission set out its views in *Murray* and *Farina*.  The panel gave almost no consideration to the preemptive effect of the Commission's RF regulations, instead focusing its preemption analysis on a single provision of the Communications Act, Section 332.  *Pinney* concluded that it could "not infer from [Section] 332 the congressional objective of achieving preemptive national RF radiation standards for wireless telephones." *Ibid.*  By focusing only on Section 332 and failing to consider the independent preemptive effect of the Commission's RF rules, the court ignored the principle that, like statutes, the "statutorily authorized regulations of an agency will preempt any state or local law that conflicts with such regulations or frustrates the purposes thereof."  *City of New York v. FCC*, 486 U.S. 57, 64 (1988); *see Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982) ("Federal regulations have no less pre-emptive effect than federal statutes.").

24

United States District Court
Northern District of California

1                              *                *                *

2          Relying on *Geier* and *Wyeth*, plaintiffs argue that their claims can only be conflict

3    preempted if Congress expressly mandated that the Commission balance varied interests when

4    regulating device RF exposure (Opp. at 17).  Plaintiffs' argument runs afoul of the same

5    principle ignored by *Pinney*.  A "preemptive regulation's force does not depend on express

6    congressional authorization to displace state law." *De la Cuesta*, 458 U.S. at 154.  But, while

7    Congress need not expressly grant an agency the power to preempt state law, plaintiffs argue

8    that Congress must nevertheless expressly charge the agency with balancing competing

9    objectives.  Not so.  Plaintiffs' argument may be wise legislative policy, but the Constitution

10   leaves such policy choices to Congress, not the courts.  As the Supreme Court recognized long

11   ago, "[b]ecause Congress could neither foresee nor easily comprehend the fast-moving

12   developments in the field, it 'gave the Commission . . . expansive powers.'" *N.B.C. v. United*

13   *States*, 319 U.S. 190, 219 (1943); *United States v. Southwestern Cable Co.*, 392 U.S. 157, 172–

14   73 (1968).  In 1996, Congress left those powers largely intact, only carving out the

15   Commission's (implied) authority to preempt local and state land use decisions.  H.R. Conf.

16   Rep. 104-458 at 208; *see also* 47 U.S.C. § 704(a).  Even then, Congress ensured that its agency

17   had the final say on RF exposure limits and compliance therewith.  *Ibid.*  To view that grant of

18   broad discretion to the Commission as somehow limiting its powers would be counterintuitive.

19         Next, plaintiffs correctly note that we do not defer "to an agency's conclusion that state

20   law is preempted." *Wyeth*, 555 U.S. at 576–77.  Instead, the weight accorded to an agency's

21   explanation of the impact state law has on the federal scheme it administers depends on its

22   thoroughness, consistency, and persuasiveness.  *Ibid.*  This is so because even though

23   "agencies have no special authority to pronounce on preemption absent delegation by

24   Congress, they do have a unique understanding of the statutes they administer and an attendant

25   ability to make informed determinations about how state requirements may pose an 'obstacle

26   to the accomplishment and execution of the full purposes and objectives of Congress.'" *Ibid.*

27   The statement here is thorough, persuasive, consistent with its past positions, and evidences

28   expertise in administering its delegated authority.

United States District Court
Northern District of California

Plaintiffs nevertheless argue that the statement should receive no weight because its position runs contrary to "decades of" policy that regarded state law as complementary, as well as previous decisions deciding against broad preemption of state tort law (Opp. at 19). Plaintiffs overstate the Commission's past reluctance to preempt. True, it chose not to adopt a federal rule of liability in 1997. But, outside of the local land use fights well-documented in the legislative and regulatory histories, there is no talk of other lawsuits, certainly none analogous to plaintiffs' at the time. The order itself merely noted that the topic was not before it and prudently "question[ed] whether such an action, which would preempt too broad a scope of legal actions, would otherwise be appropriate." *1997 RF Order*, 13 F.C.C.R. 7268 ¶ 90. And, when lawsuits like plaintiffs' were actually filed, the Commission *did* take a stance, filing amicus briefs that consistently outlined its exclusive regulatory authority over cellphone RF emissions and the threat such litigation would pose to its regulatory scheme. FCC Amicus Br., 2008 WL 7825518 at *9; U.S. Amicus Br., *Farina*, 2011 WL 3799082 at *9. The Commission's present views have remained consistent with its past views, the legislative and regulatory history, and the regulations themselves. This order thus finds no reason to discount the agency's views.

Finally, plaintiffs argue that unlike *Farina* and *Murray*, wherein the consumers sought to impose liability even though their phones *met* the federal RF safety limit, our plaintiffs allege that their cell phones *exceed* the Commission's safety limit, supposedly meaning their claims cannot conflict with federal objectives. Not so. Although plaintiffs attempt to enforce the same exposure limits set by the Commission, their claims still risk disturbing the balance struck by the Commission by "needlessly disrupt[ing] the Commission's certification process and improperly imped[ing] the marketing of cell phones that the FCC has found to be safe" (FCC Statement at 16).[7]

---

[7] The operative complaint addresses Apple's marketing of iPhones as performing larger-than-life functions "in your pocket." As discussed, the Commission found that all certified cellphones are safe, even if they exceed the RF exposure standards during use closer to the body than tested. To the extent plaintiffs' disclosure-related claims allege that Apple overstates the safety of its product, such claims are preempted in light of the Commission's safety determination and the balance it reached between safety and overwarning.

United States District Court
Northern District of California

This argument fails for another reason. The Commission is amply empowered to investigate complaints and petitions calling into question the continued compliance of certified devices with its technical standards. *See Buckman*, 531 U.S. at 341. In April 2020, for example, the FCC's Enforcement Bureau announced that it had entered into a consent decree with BLU Products, Inc., to resolve an investigation into whether the company's GRAND MAX mobile phone violated the Commission's RF limits. As part of the investigation, the FCC Lab tested the phone and found that it did not comply with the Commission's RF limits. Under the terms of the consent decree, "BLU Products admit[ted] that it violated the Commission's rules, [promised to] implement a compliance plan, and [to] pay a $130,000 civil penalty." *BLU Products. Inc.*, DA 20-305, ¶¶ 2–3 (Enf. Bur. released April 2, 2020).

Notably, the *Chicago Tribune* story that plaintiffs detailed extensively in the operative complaint spurred the Commission to investigate the *Tribune*'s claims of noncompliance, as discussed. The FCC Lab tested commercially-available iPhones as well as a model iPhone provided by Apple, and each demonstrated compliance when tested at the test separation distances used in their original certification filing (not at two millimeters, as the *Tribune* additionally had) and consistent with OED's parameters. The Lab found no evidence of violations of the technical standards. Apple's iPhones have thus demonstrated compliance with its exposure limits not once but twice (Dkt. No. 104-11). Allowing a federal jury to now second-guess the agency determinations would interfere with the balance struck in the equipment-authorization program. The federal regulations must displace plaintiffs' claims.

Plaintiffs suggest that such a ruling would leave consumers without any remedy. Not so. Aside from enforcement bureau actions as described, which are triggered by complaints or petitions filed with the Commission, plaintiffs may also challenge agency rulemaking directly. The *2019 RF Order* involved here, for example, is the subject of two consolidated petitions for review in the Court of Appeals for the District of Columbia Circuit. *See Environmental Health Trust v. FCC*, No. 20-1025 (lead); *Children's Health Defense v. FCC*, No. 20-1138 (consolidated). And, this order should not be read as standing for the proposition that all state-law claims that touch upon the federal RF regulations are preempted. If, for example, the

Enforcement Bureau were to determine that a previously-authorized device no longer complied with its RF exposure standards, consumers may have state-law remedies against the manufacturer, the compliance question already resolved by the Bureau.

## CONCLUSION

To the extent stated herein, Apple's motion for summary judgment is **GRANTED**. The parties' pending discovery disputes are **DENIED AS MOOT**. Judgment against plaintiffs and in favor of Apple will be entered separately.

**IT IS SO ORDERED.**

Dated: October 29, 2020.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE